COMMONWEALTH *vs.* DAVID PEPPICELLI
(and a companion case[1]).

No. 06-P-931.

Suffolk. May 15, 2007. - September 6, 2007.

Present: COWIN, BROWN, & MEADE, JJ.

*Practice, Criminal,* Jury and jurors, Instructions to jury. *Witness,* Expert. *Evidence,* Expert opinion, Self-defense. *Self-Defense.*

At a criminal trial, the Superior Court judge did not abuse his discretion in dismissing a deliberating juror, where the juror failed to follow the judge's repeated instructions not to discuss the substance of the case outside the jury room, and where, by discussing with a third person the substance of the case, the nature of the defense, and the victims' use of cocaine, the juror exposed himself to an extraneous influence in the form of that third person's opinion relative to the moral worth of the defendants and the victims' family [93-95]; further, the judge's instruction to the jury following the removal of the juror did not create a substantial risk of a miscarriage of justice [95-96].

A Superior Court judge did not abuse his discretion by excluding from evidence at a murder trial expert testimony regarding objective standards of the use of a firearm in self-defense, where he determined that the jury did not need the assistance of an expert in deciding whether the defendants acted reasonably. [96-97]

In denying two criminal defendants' motion for a new trial, a Superior Court judge did not err in not applying retroactively the common-law rule of evidence announced in *Commonwealth* v. *Adjutant,* 443 Mass. 649 (2005), where the new rule was neither implicit in the concept of ordered liberty nor central to an accurate determination of innocence or guilt, and where the defendants failed either to raise the issue at trial or to excuse that failure by any applicable exception to the waiver doctrine. [97-101]

INDICTMENTS found and returned in the Superior Court Department on November 9, 1999.

[1]Commonwealth *vs.* Paul Peppicelli. Although the defendants have spelled their surname as Pepicelli in various filings below and on appeal, it is our practice to employ the spelling of the defendants' names as they appear on the face of their indictments.

The cases were tried before *Patrick F. Brady*, J., and a motion for a new trial, filed on December 5, 2005, was heard by him.

*Lisa J. Steele* for David Peppicelli.

*Steven J. Brooks* for Paul Peppicelli.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

*Matthew H. Bower*, of Virginia, & *Karen L. MacNutt*, for National Rifle Association of America, amicus curiae, submitted a brief.

MEADE, J. The defendants were each indicted for murder in the first degree of David Stivaletta (David S.) in violation of G. L. c. 265, § 1, two counts of armed assault with intent to murder in violation of G. L. c. 265, § 18(*b*), and two counts of assault and battery by means of a dangerous weapon in violation of G. L. c. 265, § 15A. After a joint trial, David Peppicelli (David P.) was convicted of voluntary manslaughter, and Paul Peppicelli (Paul P.) was convicted of one count of assault and battery by means of a dangerous weapon (a cane). On appeal from the judgments and the denial of their new trial motion, the defendants claim that the trial judge improperly removed a deliberating juror and failed properly to instruct the jury regarding the removal, abused his discretion by excluding the defendants' expert witness, and failed retroactively to apply the common-law rule of evidence announced in *Commonwealth* v. *Adjutant*, 443 Mass. 649 (2005). We affirm.

*Background.* 1. *The crimes.* Based on testimony at trial, the jury were entitled to find the following.[2] On September 2, 1999, while Timothy Martin was driving in Kenmore Square in Boston, his car was struck from behind by a car driven by Anna Aliano, causing minor damage to both cars. Martin did not know Aliano by name, but he knew that she and her boyfriend, Joseph Peppicelli (Joseph P.), the defendants' brother, patronized the same gym to which he belonged. An argument ensued as to who was at fault for the accident, which culminated in Martin threatening to kill Aliano and her boyfriend.[3]

---

[2] Additional facts will be discussed as they relate to the defendants' specific claims of error.

[3] Later that same night, an angry Joseph P. spoke to Martin on the telephone

On the morning of September 4, 1999, a store owner in the North End section of Boston told Martin that he had seen "four big guys," one of whom was using a cane, outside Martin's North Street apartment building, looking up at the windows and checking the door bells. Believing that the traffic incident had escalated, Martin called his friend Arthur Stivaletta (Arthur S.), who in turn gathered together David S.; David S.'s son, Scott Stivaletta (Scott S.); and their friend Christopher Luciano, and drove to meet Martin at his apartment.

Martin, Luciano, and the three Stivalettas (collectively, the Stivaletta group) walked from North Street to Michelangelo Street, where they believed the defendants lived. Michelangelo Street is a small dead-end street off of Charter Street in the North End. Martin was armed with a "sap stick"[4] and an unlicensed .38 caliber revolver. No one else in the group was armed. Upon reaching what he thought was the Peppicelli home, Martin announced himself in the event that anyone was looking for him. Receiving no response, the Stivaletta group walked back to the corner of Charter Street.

Nearing the corner, the Stivaletta group came upon David P., Paul P., and a third man. Paul P. approached the group and asked for Martin to identify himself. Paul P. said words to the effect of, "So you're the guy that threatened my brother," and began hitting Martin in the head with his cane. A fistfight ensued. While fighting, Martin heard someone say, "What do you want, some of this?" He looked in the direction of the voice and saw a man waving a gun. When his attention was refocused on his fistfight, he heard a gunshot. David P. had shot David S. in the stomach at close range. As David S. fell, he told his son to run. Scott S. and Luciano fled the scene. Arthur S., engaged in a separate altercation with the defendants' knife-wielding companion, eventually fled as well.

While this was occurring, Martin ducked behind some cars parked on Charter Street and took out his gun. When Paul P. saw Martin's drawn gun he said, "Oh, do you want to play like

and accused Martin of causing the accident. At the conclusion of that conversation, the two reached an agreement whereby Martin would provide his insurance information but would not pay for the damage to Aliano's car.

[4]A "sap stick" is a leather-bound lead bar.

that?" Paul P. then drew his own gun and started firing at Martin. David P. fired at Martin as well. Several bullets hit the cars in the area where Martin was hiding, and one bullet grazed the back of Martin's head. Bleeding from his head, Martin too fled the scene.

When the police and emergency medical personnel arrived, they found David S. lying in the street. He was conscious but confused and unable to say more than a few garbled phrases. There were no weapons on or near him. He was taken to the hospital, where he died soon after from the single gunshot wound to his abdomen.

The police found the defendants and a third man, Walter Belmonte, standing nearby with their hands raised. The police recovered from the scene two Glock .40 caliber semiautomatic pistols, four magazines that fit the Glocks, and eighteen spent .40 caliber shell casings. The defendants were the licensed owners of the Glocks.[5] Seven shots had been fired by Paul P.'s gun, and eleven by David P.'s gun. The only other firearm recovered by the police was Martin's .38 caliber revolver, but they found no evidence that it or any unrecovered gun had been fired at the scene.

2. *The defense.* From the defense witnesses, the following emerged: David P. was armed that day and he carried a gun as a matter of routine; he was unaware of the traffic incident involving Martin and Aliano. David P. and his brother Paul P., who recently had knee surgery and used a cane, were walking to their home in the North End when they saw Martin yelling, "Are you fucking looking for me? I'm fucking Timmy Martin, are you looking for me?" Paul P. said, "Who's Timmy Martin?"

David P. then saw the Stivaletta group, and what appeared to be a gun in Martin's right hand. From David P.'s perspective, the Stivaletta group was "rushing at us all at one time," but he was nonetheless focused on Martin because he saw that Martin had a gun in his hand. When Martin started to raise the gun, David P. yelled "Paul, gun," in order to warn his brother. Paul P. slapped Martin's hand, which held the gun, and began swinging the cane at him. David P. then saw "a hand come up from the back" of

---

[5]Three knives also were recovered from the defendants.

the group and point what appeared to be another gun, which fired a shot. He thought the second gunman was Scott S. David P. then turned to the right and saw David S. standing directly in front of him with a silver revolver in his hand. David P. reacted by pulling his gun and shooting David S. once in the abdomen.

After being shot, David S. walked a short distance and appeared to hand something to Scott S.,[6] who then ran away with Luciano. David P. approached David S. with his gun in a "safe position" and demanded to know where David S.'s gun was; David S. reportedly replied that he no longer had it. The defendants yelled for someone to call 911. Within a few moments, David P. saw Martin behind the parked cars with a gun. Martin fired a shot at Paul P., and both defendants returned fire toward Martin before Martin fled. Upon hearing sirens, the defendants unloaded their guns and placed them on a nearby table, raised their hands in the air, and waited for the police to arrive.[7]

3. *The removal of the deliberating juror.*[8] On a Monday, the trial judge dismissed a deliberating juror one week after deliberations had begun. On the previous Friday, the jury had reported reaching verdicts on four of the indictments, but they were deadlocked on the remaining six counts. The judge delivered a *Tuey-Rodriquez* instruction, see *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3 (1851); *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973), and deliberations resumed. No further progress was made by the end of the day, and the jury were sent home for the weekend.

Over the weekend, the juror in question was shopping at a Home Depot store in the Boston area. While he stood in a checkout line, the juror initiated a conversation with another patron. The patron, who was a stranger to the juror, was Kevin Todd,

---

[6]Scott S. denied that David S. had a gun, and Luciano denied that David S. ever got close enough to Scott S. after the shooting to hand him anything. No other witness saw David S. holding a gun.

[7]Belmonte, the man found standing with the defendants, testified that he did not come to the scene with the defendants or participate in the altercation.

[8]We draw the facts on this subject from the findings of the judge, set out in his memorandum of decision on the defendants' new trial motion, and also directly from undisputed matter in the trial record where necessary. The defendants do not claim error in any subsidiary findings.

who worked as a police officer for the Department of Public Health. The juror told Todd that it was "good to be out" and that he had been serving as a juror on a murder trial for the past six weeks. The juror mentioned the Peppicellis and asked Todd if he knew the Stivalettas. Todd said yes because he had read about the case in newspaper accounts. The juror then said, "As far as I'm concerned they're going to walk. I didn't see a shred of evidence that would convict either one of them, the brothers. I considered it self-defense." Todd responded, "Well, yeah, they're all pieces of crap anyway." The juror added that the Stivalettas were looking for trouble, and that based on toxicology reports, "they must have been snorting [cocaine] all night."

The conversation lasted about three minutes; the juror did most of the talking. Todd later notified the Boston police department about the encounter, and the matter was brought to the attention of the trial judge. After conducting an evidentiary hearing in which he heard testimony from both Todd and the juror, and over the defendants' objections, the trial judge excused the juror from further service. The judge opined that the juror's testimony had not been "candid."[9]

The judge stated that he dismissed the juror because he had violated the judge's "repeated and emphatic" instructions not to discuss the case with anyone. The judge found the violation to be "egregious" and to have exposed the juror to extraneous information concerning the trial's participants that he should not have heard. The defendants asked for a two-hour recess to permit them to research the relevant case law for juror removal, but the judge denied the request.

Before announcing the juror's dismissal to the remaining members of the jury, the judge asked defense counsel if they wanted him to say anything specific to the jury; they did not. The judge then instructed the jury as follows:

[9]The juror's version of the Home Depot encounter had Todd doing most of the talking, and only discussing the case in general. The juror said they discussed a bar where Luciano and Scott S. retired to after the shooting. The juror characterized the bar as a "biker place" where people used cocaine. The juror denied that he discussed any other evidence in the case, but was unsure whether he shared with Todd his opinion as to the probable outcome of the case.

"I have had to excuse one of your deliberating colleagues, [juror's name]. I'm going to ask you not to speculate about the reason for that. It has nothing to do with your deliberations in the case, and it would be a mistake on your part to speculate about why I did that."

Neither defendant lodged an objection to the instruction. An alternate juror was selected, and the judge instructed the jury to begin their deliberations anew.[10] The next day, the jury acquitted the defendants of eight of the ten charges.[11]

*Discussion.* 1. *Discharge of deliberating juror.* Both defendants claim error in the trial judge's decision to remove the deliberating juror. The judge addressed this issue both at trial and in the context of the defendants' joint motion for new trial pursuant to Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979), which he denied. On appeal, our review of that denial does not permit us to substitute our judgment for that of the trial judge, who had "the advantage of face to face evaluation of the witnesses and the evidence at trial" and was in "a far better position than we[] to make the judgment required by [rule 25(b)(2)]." *Commonwealth v. Chhim,* 447 Mass. 370, 381 (2006), quoting from *Com-*

[10]In the judge's initial instructions to the jury prior to the beginning of deliberations, the judge stated why alternate jurors were necessary:

"I can't dismiss the alternates because they [may] be needed in the event that for some reason I may have to excuse a deliberating juror or more than one for reasons having to do with, say, personal emergency or sickness or something like that, something totally removed from how a juror may be, any positions that he or she may be taking on the issues because it would be totally inappropriate and unlawful for a judge to excuse a juror whose viewpoints may seem to the others on the jury somewhat at odds or idiosyncratic or anything of that nature."

[11]On the murder indictment, David P. was convicted of the lesser included offense of voluntary manslaughter. He was acquitted of armed (knife) assault with intent to murder Arthur S., armed (handgun) assault with intent to murder Martin, assault and battery by means of a dangerous weapon (handgun) upon Martin, and assault and battery by means of a dangerous weapon (cane) upon Martin.

Paul P. was convicted of assault and battery by means of a dangerous weapon (cane) upon Martin. Paul P. was acquitted of the murder of David S., armed (knife) assault with intent to murder Arthur S., armed (handgun) assault with intent to murder Martin, and assault and battery by means of a dangerous weapon (handgun) upon Martin.

*monwealth* v. *Cobb*, 399 Mass. 191, 192 (1987). Similar deference governs review of a trial judge's discharge of a deliberating juror when the issue is raised on direct appeal. See *Commonwealth* v. *Tennison*, 440 Mass. 553, 558 (2003). Therefore, we decide whether the judge committed an abuse of discretion or other error of law. See *ibid.*; *Chhim, supra.* There was neither.

Discharge of jurors is governed by two statutes. The first is G. L. c. 234A, § 39, which generally provides a trial judge with "the discretionary authority to dismiss a juror at any time in the best interests of justice." G. L. c. 234A, § 39, inserted by St. 1982, c. 298, § 1. Specific to a deliberating juror, § 39 states that "[t]he court shall have authority to excuse and discharge a juror participating in jury deliberations after a hearing only upon a finding of an emergency or other compelling reason." *Ibid.* The second is G. L. c. 234, § 26B, which provides that "[i]f, at any time after the final submission of the case by the court to the jury and before the jury has agreed on a verdict, a juror dies, or becomes ill, or is unable to perform his duty for any other good cause shown to the court, the court may order him to be discharged." G. L. c. 234, § 26B, as amended by St. 1979, c. 255, § 2. See Mass.R.Crim.P. 20(d)(3), 378 Mass. 891 (1979). " 'Good cause' includes only reasons personal to a juror, having nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors." *Commonwealth* v. *Connor*, 392 Mass. 838, 844-845 (1984).

The defendants claim an absence of good cause for the juror's dismissal, and that the juror's discussion with Todd at the Home Depot did not expose him to any extraneous influence. After conducting the required hearing, the judge properly rejected these claims. The discharged juror failed to follow the judge's repeated instructions not to discuss the case outside of the jury room. In fact, the juror discussed the substance of the case, the nature of the defense, and the victims' use of cocaine, and as a result was exposed to Todd's extraneous opinion relative to the moral worth of the defendants and the Stivalettas. Contrast *Commonwealth* v. *Rodriguez*, 63 Mass. App. Ct. 660, 674 (2005) (improperly dismissed juror had made cellular telephone call from inside the jury room in which she expressed her frustrations with her fellow jurors). Being outside the evidence, and prejudicial to both the defendant and Commonwealth, Todd's opinion constitutes an

extraneous matter. See *Commonwealth* v. *Kater*, 432 Mass. 404, 414 (2000) ("An extraneous issue is one that goes beyond the record and raises a serious question of possible prejudice"). Therefore, it was not an abuse of discretion for the judge to conclude that allowing the juror to return to deliberations would have "irreparably tainted the jury's deliberative process." Where there was no abuse of discretion or other error, we defer to the judge's conclusion. See *Commonwealth* v. *Tennison*, 440 Mass. at 558.[12]

2. *Jury instruction on discharged juror.* The defendants further claim that the judge's instruction to the jury following the removal of one of their members was inadequate. Specifically, the defendants claim that the instruction failed to properly convey the warning, articulated in *Commonwealth* v. *Connor*, 392 Mass. at 846, that the reason for the juror's dismissal was entirely personal and not related to the juror's views or his relationship with the remainder of the jury. However, when the judge asked the defendants what they would like him to tell the jury, they offered no suggestions, and neither defendant objected to the instruction the judge gave. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979) ("No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict . . ."). As such, we review this claim only to determine whether the judge's instruction created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Zimmerman*, 441 Mass. 146, 150-151 (2004); *Rodriguez*, 63 Mass. App. Ct. at 676-678. We discern no such risk.

As a starting point, we note that the judge was not required to adhere to the precise language set out in *Connor*. See *Zimmerman, supra* at 151. After discharging the juror, the judge informed the jury about the action he had taken and told them not to

---

[12]There is likewise no merit to the defendants' claim that the judge erred by not specifically inquiring of the juror whether he could remain impartial. The judge was not required to make such an inquiry. Compare *Tennison*, 440 Mass. at 558-560. In fact, after the judge examined the juror, he stated that the juror's testimony had not been candid. Given his assessment of the juror's credibility, nothing would have been gained by an assurance from the juror that he could remain impartial. See *Commonwealth* v. *Young*, 401 Mass. 390, 405-406 (1987) (judge is entitled to disbelieve juror's assertion regarding his ability to be impartial).

speculate as to why he did it because it was not related to, and had nothing to do with, their deliberations. Moreover, one week earlier, prior to deliberations, when the judge was selecting alternate jurors, he explained that a deliberating juror could only be removed for "personal emergency or sickness or something like that, something totally removed from how a juror may be, any positions that he or she may be taking on the issues because it would be totally inappropriate and unlawful for a judge to excuse a juror whose viewpoints may seem to the others on the jury somewhat at odds or idiosyncratic or anything of that nature." See note 10, *supra*. Together, these instructions more than adequately conveyed the prophylactic message intended by *Connor*.

Contrary to the defendants' claim, their case is not like *Commonwealth* v. *Rodriguez*, 63 Mass. App. Ct. at 678, where it was inevitable that the jury would conclude that the juror was removed because of her viewpoint, and the failure to adhere to *Connor* risked a miscarriage of justice. In *Rodriguez*, the juror misconduct took place in the jury room and was reported to the judge by the other jurors. *Id.* at 664-670. Here, however, the trial judge found that the juror's misconduct took place outside the jury's presence and without their knowledge, such that there was no reason for them to conclude his removal was related to the deliberations. Also, the juror in *Rodriguez* was apparently the cause of the deadlock, *id.* at 677-678, whereas here, as the judge found, there was no evidence that the discharged juror was functioning as a hold-out for the defense. There was no risk that justice miscarried, and there was no abuse of discretion in the judge's denial of this claim in the defendants' postconviction motion.[13]

3. *The excluded expert testimony.*[14] David P. claims that the trial judge abused his discretion by excluding expert testimony regarding objective standards of the use of a firearm in self-defense. We disagree. "The admission of expert testimony lies

---

[13]There is also no merit to David P.'s highly speculative claim, which he later expressed at sentencing, that the jury might have sensed the judge's skepticism about the defendants' self-defense claims. To the extent the jury could have intuited such a belief, the judge disabused them of that notion with his instruction that they should not interpret anything he had said or done during the trial as an indication that he had an opinion about the case.

[14]We acknowledge the amicus brief of the National Rifle Association on this issue.

'largely in the discretion of the trial judge.' " *Commonwealth* v. *Hudson*, 417 Mass. 536, 540 (1994), quoting from *Commonwealth* v. *Maltais*, 387 Mass. 79, 93 (1982). A judge should not admit expert testimony unless the judge determines that the subject of the expert's testimony is "one on which jurors need assistance and can be helped, and will not be confused or misled, by the expert's testimony." *Commonwealth* v. *Santoli*, 424 Mass. 837, 844 (1997). "The judge's ruling will be reversed on appeal only if it constituted an abuse of discretion or was otherwise tainted with error of law." *Commonwealth* v. *Richardson*, 423 Mass. 180, 182 (1996).

The defendants sought to have their expert testify generally about the reasonableness of the use of firearms by civilians for self-defense in various situations, but they offered the trial judge no authority in support of the propriety of their request. The trial judge excluded the evidence based on his determination that the jury did not need the assistance of an expert in deciding whether the defendants acted reasonably.[15] The judge also noted that the expert's experience in training police officers, who have a duty to preserve safety and apprehend criminals, would not be relevant to the reasonableness of the actions taken by a civilian. We cannot fairly say — as we would be required to say to conclude that the judge abused his discretion — that "no conscientious judge, acting intelligently, could honestly have taken the view expressed" by him. *Commonwealth* v. *Anderson*, 445 Mass. 195, 209 (2005), quoting from *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001).

4. *Retroactivity of* Adjutant. The defendants both claim that the trial judge erred in denying them a new trial because they should

[15]The verdicts alone belie the claim that the jury needed assistance in determining the reasonableness of the defendants' actions. To have acquitted the defendants of murder and five of the six gun charges, the jury had to have discounted the Commonwealth's theory that the defendants intended the gun fight and acted unreasonably. To convict David P. of manslaughter, the jury most likely believed that David S. was not armed and that by shooting him, David P. used force in excess of that reasonably justified in self-defense. See *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990) ("Voluntary manslaughter is unlawful homicide arising not from malice, but 'from the frailty of human nature,' as in a case of 'sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense' "), quoting from *Commonwealth* v. *Nardone*, 406 Mass. 123, 130-131 (1989).

have received the retroactive benefit of the common-law rule of evidence announced in *Commonwealth* v. *Adjutant,* 443 Mass. 649 (2005), to support their claim that they acted in self-defense. *Adjutant* was decided after the trial in this case but before the defendants' new trial motion. In *Adjutant,* the Supreme Judicial Court held that "where the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense." *Id.* at 664.[16] The decision identified a "new common-law rule of evidence," *id.* at 667 — applicable even when the defendant is unaware of the victim's violent acts, *id.* at 655 — that the Supreme Judicial Court would apply only prospectively. *Id.* at 667. Despite that, the court applied the rule to Adjutant herself because the identity of the first aggressor was paramount in her case, and because she had sought to introduce evidence of the victim's prior violent acts at trial to support the claim that the victim was the first aggressor. *Id.* at 652-653, 666.

More recently, in *Commonwealth* v. *Pring-Wilson,* 448 Mass. 718 (2007), where the identity of the first aggressor was "hotly contested" at the defendant's pre-*Adjutant* murder trial, the Supreme Judicial Court again gave a defendant the retroactive benefit of the *Adjutant* rule. *Id.* at 733, 736-737. In affirming the trial judge's grant of a new trial, the court reasoned that Pring-Wilson was "in the same shoes as Adjutant in that, in both cases, the defendants attempted to introduce evidence of the victims' violent propensities, and both pursued the matter before their convictions had become final through direct appeals." *Id.* at 736. The court stressed that Pring-Wilson, albeit without success, "sought aggressively and repeatedly . . . to introduce evidence of [the victim's and his cohort's] violent histories to illuminate the matter." *Id.* at 736-737.

Although the defendants have pursued their *Adjutant* claim prior to the conclusion of direct review, they have done so only

---

[16]"[T]he right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault unless that person withdraws in good faith from the conflict and announces his intention to retire." *Commonwealth* v. *Maguire,* 375 Mass. 768, 772 (1978).

within a postconviction motion. Unlike Pring-Wilson, the defendants cannot wedge themselves into *Adjutant*'s shoes where they never attempted to introduce any *Adjutant* evidence at trial. See *Pring-Wilson, supra* at 729 n.12 (cataloguing the *Adjutant* evidence that the defense was prepared to offer at trial). Rather, both defendants sought only to impeach the testifying Stivaletta group members with their prior convictions, and they explicitly denied an intention to introduce any other evidence of the group members' prior bad acts. While David P. sought to demonstrate that the Stivalettas had reputations as "tough guy[s]," such reputation evidence is inadmissible and does *not* qualify as *Adjutant* evidence. See *Adjutant*, 443 Mass. at 664-665. See also *Pring-Wilson*, 448 Mass. at 737 (on retrial, "the judge may admit evidence of [the victim's] specific acts of prior violent conduct but may not admit evidence of his general reputation for violence"). Because the defendants did not seek to introduce specific acts of prior violence at trial, they are not entitled to the limited exception to the prospective-only rule announced in *Adjutant*.

The defendants also seek retroactive application of *Adjutant* by operation of the second exception to the framework of *Teague* v. *Lane*, 489 U.S. 288, 311-313 (1989), which otherwise prohibits the retroactive application of a new rule to a case on collateral review. See *Commonwealth* v. *Bray*, 407 Mass. 296, 303 (1990). This exceedingly narrow exception applies when the new rule is (1) "implicit in the concept of ordered liberty," implicating "fundamental fairness," and (2) "central to an accurate determination of innocence or guilt," such that its absence "creates an impermissibly large risk that the innocent will be convicted." *Teague, supra* at 311-313 (citations omitted). See *Bray, supra.*

The trial judge in *Pring-Wilson* used this exception to apply *Adjutant* retroactively, but the Supreme Judicial Court neither adopted nor discussed that rationale.[17] Indeed, admitting evidence of a victim's past history for violence to establish who was the first aggressor is neither "implicit in the concept of ordered liberty" nor a procedure that, by itself, would be necessary to the

---

[17]The Superior Court judge's memorandum of decision was available in the record appendix submitted in the *Pring-Wilson* appeal.

determination whether and to what extent a defendant properly acted in self-defense. Put another way, *Adjutant* did not announce a watershed rule of criminal procedure that implicates fundamental fairness. See *Saffle* v. *Parks*, 494 U.S. 484, 495 (1990). See also, e.g., *Whorton* v. *Bockting*, 127 S. Ct. 1173, 1181-1184 (2007) (rule announced in *Crawford* v. *Washington*, 541 U.S. 36 [2004], not a watershed rule to be applied retroactively); *Bray*, 407 Mass. at 303 (new rule that jury may consider defendant's mental impairment as one factor bearing on malice was not retroactive because it was not central to an accurate determination of guilt or innocence of murder).

Finally, there is no merit to the defendants' claim that the "clairvoyance" doctrine should excuse their failure to raise the *Adjutant* issue at trial. This exception to the waiver doctrine "applies to errors of a constitutional dimension 'when the constitutional theory on which the defendant has relied was not sufficiently developed at the time of trial or direct appeal to afford the defendant a genuine opportunity to raise his claim at those junctures of the case.' " *Commonwealth* v. *Randolph*, 438 Mass. 290, 295 (2002), quoting from *Commonwealth* v. *Rembiszewski*, 391 Mass. 123, 126 (1984). As stated *supra*, *Adjutant* has no constitutional component, and the defendants have pointed to no case that applies the clairvoyance exception to a new common-law rule of evidence. See *Commonwealth* v. *Dagley*, 442 Mass. 713, 721 & n.10 (2004), cert. denied, 544 U.S. 930 (2005) (refusing to apply retroactively a new common-law rule of evidence).

Finally, even if the clairvoyance exception applied outside the constitutional context, it would offer no relief in these circumstances. To apply the exception, the court must determine whether the legal theory upon which the defendants now rely was sufficiently developed at the time of trial to put counsel on notice as to the availability of the claim. See *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 248 (1980). The court "do[es] not require that defense counsel foresee developments in the case law." *Commonwealth* v. *Garcia*, 379 Mass. 422, 439-440 (1980).

In this case, at the time of trial, at least forty-five States and the Federal courts allowed a defendant claiming self-defense to introduce evidence of the victim's propensity for violence to

show that the victim was the first aggressor. See *Adjutant, supra* at 654-656 & nn. 7-8. Contrast *Commonwealth* v. *D'Agostino,* 421 Mass. 281, 284-285 (1995) (not reasonable for defendant to foresee new Massachusetts constitutional rule barring admissibility of defendant's refusal of a breathalyzer test when, at time of trial, Federal law and law of a number of other jurisdictions was to the contrary). Accordingly, the defendants need not have been possessed of any extraordinary prognosticative skills to have foreseen and raised the issue. See *Pring-Wilson,* 448 Mass. at 735-737 (defendant able to preserve *Adjutant*-type claim at trial held before *Adjutant* was decided). The motion for new trial was properly denied.[18]

*Conclusion.* The judgments and the order denying the defendants' joint motion for new trial are affirmed.

*So ordered.*

---

[18]Given our holding, we need not review the propriety of the trial judge's determination that he would have exercised his discretion to exclude the claimed *Adjutant* evidence provided in the new trial motion.