Hillsborough-southern judicial district
No. 2005-594

THE STATE OF NEW HAMPSHIRE

v.

WILLIAM JOSEPH SULLIVAN, JR.

Argued: February 21, 2008
Opinion Issued: April 18, 2008

*Kelly A. Ayotte*, attorney general (*Thomas E. Bocian*, attorney, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BRODERICK, C.J. After a jury trial in Superior Court (*Hicks*, J.), the defendant, William Joseph Sullivan, Jr., was convicted of first degree murder, *see* RSA 630:1-a (2007), and conspiracy to commit murder, *see id.*; RSA 629:3 (2007). He appeals his convictions, arguing that the trial court erred by denying his motion to suppress evidence of self-incriminating statements he made to members of the Nashua Police Department, and by dismissing and replacing a member of his jury after the commencement of deliberations. We reverse and remand.

I

The record supports the following background information. In May 2002, the defendant met Nicole Kasinskas through an instant message service on the internet. At the time, the defendant was seventeen years old and lived with his family in Connecticut. Kasinskas, then fourteen years old, lived with her mother, Jeanne Dominico, in Nashua. The defendant and Kasinskas soon began communicating daily through the internet, letters and phone calls. In spite of the physical distance separating them, their relationship rapidly intensified; they professed love for one another within days, and soon spoke in detail of marriage and a future together.

Dominico drove Kasinskas to Connecticut to meet the defendant for the first time in August 2002, and subsequent visits soon followed. These visits led the defendant and Kasinskas to discuss the possibility of her moving to live with him. When Dominico objected to this plan, the two proposed that Kasinskas be legally emancipated. Dominico angrily refused this request, too, and similarly disapproved of Kasinskas making other moves toward cohabitation like opening a joint bank account with the defendant. Dominico's ongoing disapproval of such ideas engendered hostility and resentment in both the defendant and Kasinskas.

In early August 2003, the defendant drove to Nashua to spend a week with Kasinskas. By that time, their anger toward Dominico had crystallized. In fact, the two had moved from discussing ways to eliminate Dominico's opposition to their cohabitation to making plans to kill Dominico. During that week, Kasinskas and the defendant made four failed attempts to take Dominico's life, which ranged from poisoning her coffee creamer to an attempt to blow up her home by igniting its oil tank.

On August 6, 2003, the defendant and Kasinskas jointly carried out plans to make it look like Dominico's house had been broken into by a would-be intruder, and established false alibis for their own whereabouts. In reality, however, the defendant attacked Dominico in her home soon after she returned from work. Following an argument, he hit her with a baseball bat; once she was stunned, he then stabbed her to death.

After the murder, the defendant cleaned himself off, removed some of his bloody clothing, and collected the knives he had used in the attack. Kasinskas assisted in these efforts. The two then disposed of evidence in various locations, and went to a mall to buy the defendant new clothes.

## II

The following facts were found by the trial court in its order on the defendant's motion to suppress, and have not been challenged on appeal. Dominico's boyfriend discovered her body later in the evening of August 6 and promptly called 911. Shortly thereafter, Nashua police arrived at Dominico's home and roped off a perimeter around the residence. Sergeant William Moore took charge of "perimeter duty," and assigned Detective Shawn Hill to a position on the west side of the house.

At approximately 10:15 p.m., Hill and Moore noticed Kasinskas and the defendant approach the crime scene. Kasinskas testified that she and the defendant returned to Dominico's house with the goal of diverting suspicion from themselves. Initially, Hill told them to keep away from the residence, while Moore notified Detective Sergeant Rick Sprankle of their arrival. Sprankle ordered Moore to separate the defendant and Kasinskas and ask them to come to the Nashua Police Department for interviews. Moore then returned to where the defendant and Kasinskas stood, and, as the trial court found, explained that "they needed to be transported to the [police station]." When Kasinskas expressed concern about the defendant not knowing how to get to the station, Moore told her that he would make sure the defendant was transported there. Kasinskas was taken to the station first, while the defendant remained with Moore to await a second cruiser.

While they waited, Moore spoke with the defendant. The trial court found that their conversation was "primarily dominated by the defendant." For example, the defendant spontaneously volunteered that he did not like

police officers, and described having been charged with crimes he did not commit in the past. In response, Moore asked the defendant to give him a "fair shake." The defendant also spoke about souvenir shopping with Kasinskas that day, about Dominico, and about Dominico's relationship with Kasinskas. Throughout his conversation with Moore, the defendant was pacing freely, and at one point sat down on the trunk of his car. He did not ask to leave or to drive himself to the police station. On the other hand, Moore never informed the defendant that he was free to leave; the trial court noted that Moore "assumed that it was implied."

At around 10:27 p.m., Detective Dennis Linehan arrived on the scene, and made contact with Moore and the defendant. Linehan noted that the defendant appeared "jumpy" and was not standing in one place. Linehan told the defendant to relax, which prompted the defendant to explain that he suffered from anxiety and took medication for it. The defendant said he did not need his medication, however, and also said that he "had no problem" with coming to the station when asked to do so by Linehan. Linehan sat with the defendant in the back seat of a cruiser for the drive from Dominico's house to the station, which lasted somewhere between five and eight minutes. He did not frisk the defendant before doing so. The trial court found no evidence of the use of physical force or threatening language on the part of the officers at any point during this time period, and found that overall "the atmosphere was casual and nonconfrontational."

After being questioned separately at the station, both the defendant and Kasinskas eventually admitted their involvement in Dominico's murder. Both also led the police to the locations where they had hidden evidence.

### III

Prior to trial, the defendant moved to suppress his self-incriminating statements as the fruit of an illegal seizure of his person at the crime scene. *See State v. Belton*, 150 N.H. 741, 747, *cert. denied*, 543 U.S. 1028 (2004). After a hearing, the trial court denied his motion, ruling that the defendant had not been "seized" for constitutional purposes during his interaction with the police outside Dominico's residence. The defendant challenges this ruling on appeal. In support of his claims, he invokes the protections of both Part I, Article 19 of the New Hampshire Constitution and the Fourth Amendment to the United States Constitution. We first address his arguments under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), using federal opinions for guidance only, *id.* at 232-33.

When reviewing a trial court's order on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. *State v. Stern*, 150 N.H. 705, 708 (2004). Our review of the trial court's legal conclusions, however, is *de novo. Id.*

■■ We begin our review here with the baseline rule that the New Hampshire Constitution provides protection against unreasonable seizures. *State v. Cote*, 129 N.H. 358, 364 (1987); *see* N.H. CONST. pt. I, art. 19. An inquiry into the reasonableness of a seizure is only necessary, of course, when an individual has actually been seized. *Cote*, 129 N.H. at 364. An investigatory stop is a limited seizure. *State v. Beauchesne*, 151 N.H. 803, 809 (2005). However, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Cote*, 129 N.H. at 364 (quotation omitted). Indeed, "[a] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Beauchesne*, 151 N.H. at 809 (quotation omitted). An interaction becomes a seizure, however, when a reasonable person would no longer believe he or she is free to leave. *Id.* at 810; *State v. Quezada*, 141 N.H. 258, 259 (1996). "This occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of the person." *Beauchesne*, 151 N.H. at 810.

■■ "Circumstances indicating a show of authority might include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (quotation omitted). While "mere request[s] to communicate" generally do not amount to an official show of authority, *Quezada*, 141 N.H. at 260, the police "may not convey a message that compliance with their request[s] is required," *Beauchesne*, 151 N.H. at 809-10. Our analysis of this issue is an objective one, "requiring a determination of whether the defendant's freedom of movement was sufficiently curtailed by considering how a reasonable person in the defendant's position would have understood his situation." *Id.* at 810. Further, we conduct an inquiry into an alleged seizure while mindful of all of the circumstances surrounding the incident. *Cote*, 129 N.H. at 365; *see Quezada*, 141 N.H. at 259-60.

In this case, we agree with the trial court that the defendant was not seized during his interaction with the police at the crime scene. At the outset, we find significant distinctions between the police communication at issue here and that challenged in *Beauchesne* and *Quezada*, cases relied upon by the defendant in his brief. In both of those cases, although the police never used physical force, the defendants were ordered by officers to "stop" and answer questions. *Beauchesne*, 151 N.H. at 815; *Quezada*, 141 N.H. at 260. Such commands, coupled in both cases with a measure of investigative pursuit, would not have left a reasonable person feeling free to disregard the police and simply walk away. As a result, in both cases we found that seizures occurred. *Id.*

Here, in contrast, it was the defendant who initiated contact with the police by returning to Dominico's residence. He and Kasinskas presented themselves at the crime scene to find out what was going on with the investigation; the police did not initially ask them to stop to respond to questions. Thus, the defendant was acting "voluntarily[,] in a spirit of apparent cooperation with the . . . investigation," *Cote*, 129 N.H. at 365 (quotation omitted), when interacting with the police. This, coupled with the fact that the defendant also controlled the flow of his conversation with the officers at all times prior to his arrival at the Nashua Police Department, weighs against a finding that a reasonable person in the defendant's position would not have felt free to disregard the officers and leave. *See id.*

Moreover, despite the fact that Moore told the defendant he "needed" to be transported to the police station, this statement, in context, did not "transcend[ ] a mere request to communicate." *Beauchesne*, 151 N.H. at 815. Within, at most, twelve minutes of Moore's statement, the defendant was asked by Linehan whether he "would mind" coming to the station. The defendant immediately responded he "had no problem" with that. We find the nonbinding nature of Linehan's request significant and curative of any coercive effect Moore's statement may have had, especially since it was Linehan who actually accompanied the defendant to the police station and interviewed him on arrival.

Finally, we note that throughout his interaction with both Moore and Linehan at the crime scene, the defendant retained freedom of movement. He paced at will and at one point sat on the trunk of his own car. He was outside, as opposed to being confined, for example, in a police cruiser. *Cf. State v. Riley*, 126 N.H. 257, 264 (1985). The police made no show of force—like a display of weapons or a pat frisk—indicating that the defendant was obligated to comply with their wishes.

■ In view of all the circumstances presented here, we are not persuaded that the defendant's encounter with the police at the crime scene amounted to a seizure. The defendant voluntarily placed himself in a situation where it could only be expected that the police would request further communication. The defendant readily agreed to engage in such communication at the Nashua Police Department, and also agreed to be transported there. He experienced neither physical force nor coercive commands. In sum, the record does not support the contention that, from the time he returned to the crime scene through his transport to the police station, the defendant had any objective reason to believe that he was not free to end his conversations with Moore and Linehan and proceed on his way.

Given this holding, we need not inquire whether the police justifiably seized the defendant by possessing a reasonable suspicion that he had been

engaged in criminal activity, *see Beauchesne*, 151 N.H. at 809, or whether the taint of any illegal seizure had been purged by the time the defendant confessed, *see Belton*, 150 N.H. at 747.

The Federal Constitution offers the defendant no greater protection than does our State Constitution under these circumstances. *State v. Brown*, 155 N.H. 164, 169 (2007); *see Florida v. Bostick*, 501 U.S. 429, 434-36 (1991); *United States v. Espinoza*, 490 F.3d 41, 48-49 (1st Cir. 2007). Accordingly, we reach the same conclusion under the Federal Constitution as we do under·our State Constitution.

## IV

The defendant next argues that his federal and state constitutional rights to a fair and impartial jury were violated by the trial court's dismissal and replacement of one of his jurors, Juror 13, after the commencement of deliberations. *See Opinion of the Justices (Alternate Jurors)*, 137 N.H. 100, 103-05 (1993); *see also* U.S. CONST. amend. VI; N.H. CONST. pt. I, art. 15. Specifically, the defendant first argues that the trial court dismissed Juror 13 from the panel deciding his case without adequate cause. Second, he maintains that, even if the dismissal of Juror 13 was proper, the trial court erred when substituting an alternate by failing to secure adequate assurances from the remaining original jurors that they could feasibly restart deliberations. In this instance, we agree with the defendant that violations of his rights under our State Constitution occurred. Accordingly, we need not reach his federal constitutional claim. *See generally Beauchesne*, 151 N.H. at 807.

## A

Over the course of the defendant's trial, Juror 13 required the attention of the trial judge on a number of occasions. Following the trial court's issuance of general jury instructions on June 7, 2005, Juror 13 approached the court to inquire whether he could really be considered a "peer" of the defendant for the purpose of serving on a "jury of [the defendant's] peers." His dialogue with the court proceeded as follows:

> Juror 13: I've got a little problem as this is supposed to be a jury of our peers. I don't know Mr. Sullivan, and I don't know if that presents us a problem or not.
>
> The Court: Why? How—how could it, sir?
>
> Juror 13: Well if I'm a jury of his peers, it means I probably know him or know something about him, and—
>
> The Court: That—that's not the—the manner in which the word peer is intended. It simply means a citizen of the same—not

the—necessarily the same community, but a citizen of the United States who's competent to be a juror. That's what juror of peers means in the modern sense. Okay?

Juror 13: Okay.

This exchange prompted no questions or concerns from counsel for either the defendant or the State.

On the sixth day of trial, June 27, 2005, Juror 13 requested to be excused from court on July 5 for a medical appointment in New York City. In a conference with counsel, the trial court expressed skepticism about the location of the alleged appointment. During a *voir dire* of the juror at the end of the day, after the court made clear that an absence would require dismissal from jury service, Juror 13 offered to reschedule his appointment. On that same day, counsel for the State indicated to the court that a victim-witness advocate and an intern had observed Juror 13 sleeping "a number of times" during the trial.

On June 30, the court received two notes from Juror 13 seeking to have certain questions asked of Kasinskas, who was testifying at the time. At a bench conference with counsel just before a lunch recess, the trial judge stated that he would not allow juror questions to be transmitted to witnesses, and offered to issue an instruction to the jury to that effect. The parties agree, however, that no such instruction was actually given to the jury as a result of this conference.

On July 7, Juror 13 again submitted a question for a witness. On that day, after consultation with counsel, the court did address the jury's ability to ask questions:

> The court has been handed a few more questions. And perhaps it's a good time for the court to remind the jury that at this juncture it cannot answer any of those questions.
>
> . . . But in the end you'll receive written instructions after the closing arguments of counsel. . . .
>
> And part of those instructions say that if you have any questions of fact, I cannot help you. . . . But if you have questions of law . . . , in fact, you can [ask questions]—the foreperson will be asked to write them down very much in the manner that they've been written down and submitted to me now . . . and we'll get an answer to you just as soon as possible.
>
> But that only begins when deliberations begin[ ].

We note that the court mistakenly indicated to counsel on July 7 that it had already given such a caution to the jury in the past.

On the fifteenth day of trial, July 11, the State filed pleadings seeking to have Juror 13 declared an alternate. The State contended that Juror 13 had been inattentive and sleeping "through a substantial portion of the State's case-in-chief," and argued, citing *State v. Fernandez*, 152 N.H. 233, 239-40 (2005), that non-randomly selecting Juror 13 to serve as an alternate would be an appropriate exercise of discretion. In a hearing on the matter the next morning, the State supplemented its complaint vis-á-vis Juror 13 by arguing that he had also "disregarded" the court after it had "repeatedly" advised jurors not to submit questions for witnesses.

Moreover, counsel for the State reported the discovery of correspondence between Juror 13, who had apparently once been a member of the state legislature, and the Attorney General's Office. That correspondence, uncovered on the evening of July 11, related to a 2003 investigation of the juror that had produced "a strong reprimand" about his behavior while in office. The State contended that Juror 13's failure to disclose his familiarity with multiple members of the Attorney General's Office—even though they were not involved in the prosecution of the defendant—merited his dismissal, as opposed to his mere selection as an alternate.

On July 12, the trial court made the following findings and rulings in response to the State's motion:

> The fact that this juror was problematic or could have been problematic was obvious to the court from the beginning. So let's make sure that everything is on the record.
>
> The court first became concerned about this juror when he approached the court with a question following general instructions. And his question . . . was . . . roughly as follows: . . . he said, judge, you know . . . I'm supposed to be a jury of Mr. Sullivan's peers. I don't know that I'm his peer. And that was certainly an alarm bell at that juncture, but it was not a disqualifying one, by any means.
>
> The court further became concerned with . . . Juror [Number] 13 during the course of the trial because there were three periods that I observed of him . . . responding to some soporific arguments . . . that the [S]tate or the defense was attempting to offer, but nevertheless, I satisfied myself that he was sufficiently alert throughout the proceedings. . . . I was observing him very, very closely. . . .
>
> I found nothing improper in [Number] 13's attentiveness during trial. There were three very brief periods where he appeared to be asleep, but they were very brief and they were not essential periods of the trial.

. . . .

As to the notes, the court is not overly troubled by the fact that he repeatedly sent notes. They actually, to some degree, evinced a close awareness of what was going on in the trial and a very close concern about the nature of the testimony. . . .

The most troubling aspect, though, starts with the contact, the apparent history of contact, with the Attorney General's Office. Even in the most rudimentary form, the court inquired on the first day whether the [pro]spective jurors had had any dealings with any of the attorneys. . . . And it's clear that probably [Juror 13] didn't ever have any contact with [the prosecutors], but he certainly has had contact with people with the Attorney General's Office. . . .

The court cannot say in a vacuum, though, that that is a violation of his oath as a juror, which is what I'm ruling would be required[ ] to disqualify him. . . .

. . . .

. . . It's just as likely that he has forgotten [about the correspondence] based upon what I've observed of this gentleman.

. . . .

The constitutional issue has been framed and I just can't say, applying the general standards of what's speculation and what isn't, I can't say that this juror has violated his oath intentionally and that he is subject to disqualification . . . .

See also New Hampshire Juror Oath, available at http://www.courts. state.nh.us/jury/juror_handbook.htm ("You solemnly swear or affirm that you will carefully consider the evidence and the law presented to you in this case and that you will deliver a fair and true verdict as to the . . . charges against the defendant."). Juror 13 thus remained impaneled through closing arguments and the court's jury instructions, and was not chosen (randomly or otherwise) to be an alternate prior to the start of deliberations.

On July 14, 2005, the second day of deliberations, the trial judge received a note from the jury foreman stating the following:

I do not know if I am required to report this, but I am and letting you know.

One of the jurors brought in what looks to be some sort of law book. He opened it for just a second (perhaps 5-10 seconds), when

several other jurors recognized it and asked him to put it away. (Knowing it was not supposed to be here.)

He put it back in his bag and did not refer to it.

As I noted, I am not sure if you need any other information on this, or what else I should or could do.

The juror referred to by the note was Juror 13, and the "law book" in question was a copy of BLACK'S LAW DICTIONARY.

The court immediately halted deliberations and conducted a *voir dire* of Juror 13, who stated that he had planned to look up the word "conspiracy" in the dictionary because, in his view, the court's definition "didn't seem to be totally complete." Juror 13 also stated that he had not used the dictionary prior to coming to court, and had not had time to read anything in it before his fellow jurors told him to put the book away.

In response to this information, the State renewed its motion to remove Juror 13 from the panel. The defense again objected, raising constitutional arguments and labeling Juror 13's actions "innocuous" given that he had not been able to actually utilize the book. At this juncture, the trial court made the following findings and ruling:

> Well, what [the defendant] is entitled to is a jury as impartial as the law of humanity will permit, among other things. But all parties are entitled to jurors who will refrain from violating their oath[s]. And it's a pattern with this gentleman that has raised serious concerns in this court's mind about his ability to adhere to his oath and deliberate consistent with the instructions.
>
> And so that the record is clear, this is the [juror] who, after having been told repeatedly that he was not allowed to submit questions, continually throughout the trial submitted written questions to me.
>
> . . . [T]his is the juror who repeatedly sought to ask questions after having been told not to do so and they are all marked as court exhibits in this case.
>
> This is a juror who was specifically instructed that he is to decide the case, he and his fellow jurors are to decide the case based solely on the evidence and the law as I gave it to them. And he deliberately went out of his way to obtain law as provided by BLACK'S LAW DICTIONARY.
>
> And as a result of this cumulative effect, I find that he is disqualified and I'm rejecting [defense counsel's] request to have additional time to research it.

It is a fundamental matter, I will grant you that, but it is a fundamental duty of this court to ensure that deliberations are done properly by jurors who have the capacity to follow their oath[s].

. . . .

It's a deliberate inability [ ]or a deliberate refusal . . . to follow clear instructions from this court. And that I submit to you is clear grounds for disqualification.

Over defense counsel's repeated objections, the trial judge then instructed the clerk of court to draw the name of an alternate to replace Juror 13.

■ We turn now to the defendant's argument that the trial court lacked sufficient cause to dismiss Juror 13. Appellate review of a trial court's decision to dismiss a deliberating juror is for an unsustainable exercise of discretion. *See Com. v. Zimmerman*, 804 N.E.2d 336, 340 (Mass. 2004); Annotation, *Propriety, Under State Statute or Court Rule, of Substituting State Trial Juror With Alternate After Case Has Been Submitted to Jury*, 88 A.L.R.4TH 711, § 10(a) (1991 & Supp. 2007); *see also State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). Given the sensitive nature of the decision to remove a deliberating juror, a juror's "inability to perform must appear in the record as a demonstrable reality." *People v. Williams*, 21 P.3d 1209, 1213 (Cal. 2001) (quotations omitted); *see Lambert*, 147 N.H. at 296 (record must establish an objective basis to sustain discretionary decision below). To "perform," in this context, means to carefully consider the evidence presented at trial, and to deliver a fair and true verdict on the charges against the defendant in accordance with the law outlined by the trial court.

■ RSA 500-A:13, V (1997) permits the substitution of an alternate juror for a sitting juror after the commencement of deliberations in the event that a sitting juror becomes "disqualified." While this statute serves the laudable goal of preventing unnecessary mistrials, it also implicates a defendant's right under our State Constitution to have a fair and impartial jury resolve his case. *See Opinion of the Justices*, 137 N.H. at 103-05; *see also* N.H. CONST. pt. I, art. 15; *State v. Colbert*, 139 N.H. 367, 371-72 (1995). This is because "[t]he jury room is sacrosanct," *State v. Alexander*, 143 N.H. 216, 227 (1998), and "a just verdict cannot be reached if there is an inappropriate interference with or intrusion upon the deliberative process," *People v. Burnette*, 775 P.2d 583, 590 (Colo. 1989). "The discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error." *Opinion of the Justices*, 137 N.H. at 104 (quotation omitted).

Where an alternate juror is inserted into a deliberative process in which some jurors may have formed opinions regarding the defendant's guilt or innocence, there is a real danger that the new juror will not have a realistic opportunity to express his views and to persuade others. Moreover, the new juror will not have been part of the dynamics of the prior deliberations, including the interplay of influences among and between jurors, that advanced the other jurors along their paths to a decision. Nor will the new juror have had the benefit of the unavailable juror's views.

*Burnette*, 775 P.2d at 588 (citations omitted); *cf.* ABA STANDARDS FOR CRIMINAL JUSTICE, DISCOVERY AND TRIAL BY JURY § 15-2.9 cmt. at 177 (3d ed. 1996) (given risks involved, "this standard comes down firmly on the side of prohibition of using an alternate juror once deliberations have begun"). We have consequently held that "[t]he discharge of a deliberating juror is . . . to be done only in special circumstances, and with special precautions." *Opinion of the Justices*, 137 N.H. at 104-05 (quotation omitted).

■■ Specifically, trial courts must scrupulously avoid interrupting the natural flow of deliberations without just cause. Thus, prior to removing a deliberating juror, we require trial courts to ask questions of that juror and make findings on the record establishing a "meritorious reason" for dismissal. *Id.* at 105. Great care must be taken to ensure that a lone dissenting juror is not permitted to evade his or her responsibilities. *Id.* "Good cause [for dismissing a deliberating juror] includes only reasons personal to a juror, having nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors." *Com. v. Connor*, 467 N.E.2d 1340, 1346 (Mass. 1984) (quotation omitted); *see Opinion of the Justices*, 137 N.H. at 104 (citing same standard).

■ As the defendant concedes, a juror's failure or refusal to follow the instructions of the court may be a meritorious reason for dismissal. *See Com. v. Peppicelli*, 872 N.E.2d 1142, 1148-49 (Mass. App. Ct. 2007). However, the mere failure to follow instructions, in and of itself, is not a meritorious reason to dismiss a juror *per se*. *See Com. v. Rodriguez*, 828 N.E.2d 556, 565-66 (Mass. App. Ct. 2005).

For example, in *Rodriguez*, the trial judge discharged a deliberating juror for "violat[ing] her oath by discussing the deliberations over the phone with a third party within the earshot of other jurors." *Id.* at 565 (quotation and brackets omitted). The juror did not, however, discuss the substance of the jury's deliberations over the phone. Instead, she complained about having poor relations with her fellow jurors and about "her

apparent hold-out position," *i.e.*, her being the lone vote for acquittal. *Id.* at 565. In finding that the trial court had abused its discretion by dismissing the juror for using the phone, the Massachusetts Appeals Court noted the lack of findings that the juror was unable to be fair and impartial or unable to continue deliberating. *Id.* at 566. Therefore, the juror's failure to follow instructions was deemed essentially harmless.

In contrast, *Peppicelli* illustrates the necessity of dismissing a deliberating juror whose failure to follow court instructions could affect the deliberative process. *Peppicelli*, 872 N.E.2d at 1148-49. In that case, a juror, while shopping at a Home Depot, discussed the substance of the murder trial to which he had been assigned. The patron with whom he conversed happened to be an off-duty police officer, who readily offered his unfavorable opinion of the defendant involved. The officer later reported his interaction with the juror to the presiding judge. In this instance, the Appeals Court held that "it was not an abuse of discretion for the judge to conclude that allowing the juror to return to deliberations would have irreparably tainted the jury's deliberative process." *Id.* at 1149 (quotation omitted).

A survey of reported decisions from other jurisdictions supports this line of reasoning. In general, those cases illustrate that dismissal of a juror is warranted where a failure or refusal to follow instructions will likely have some impact on that juror's impartiality and ability to decide the case in question, or on the deliberative process as a whole. *See, e.g., United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (juror intent on nullifying charges regardless of oath to consider evidence and applicable law properly dismissed); *People v. Diaz*, 115 Cal. Rptr. 2d 799, 803-08 (Ct. App.) (intimidated and emotionally unstable juror who refused to deliberate properly dismissed), *cert. denied*, 537 U.S. 907 (2002); *Cloud v. State*, 510 S.E.2d 370, 372 (Ga. Ct. App. 1998) (same); *Boler v. State*, 522 S.E.2d 676, 677 (Ga. Ct. App. 1999) (juror met with relative during lunch break to seek input on guilt of defendant; "sound basis" for dismissal); *Kalianov v. Darland*, 252 N.W.2d 732, 737 (Iowa 1977) (juror who conducted out-of-court evidence gathering properly dismissed).

Therefore, we hold that a failure to follow the court's instructions constitutes a meritorious reason to disqualify a deliberating juror, *see* RSA 500-A:13, V, only if it is more likely than not that the juror's disobedience will have a relevant demonstrable impact on the deliberative process. Relevant impacts include, most pertinently, an effect on the individual juror's ability to impartially consider the evidence presented at trial, or to apply the law as outlined by the trial court. Absent these types of impacts, the necessity of dismissing a deliberating juror is lessened considerably,

and should not be done over a defendant's objection. Indeed, where it is the defendant who opposes the discharge of a particular juror, disqualification for more general disobedience will likely amount to an unsustainable exercise of discretion and grounds for reversal. *See Connor*, 467 N.E.2d at 1347.

In the present case, given the trial judge's extensive findings on July 12, the record does not fairly support his July 14 conclusion that Juror 13 had engaged in a "pattern" of disobedience amounting to a violation of his oath. On July 12, the trial court dismissed Juror 13's sleeping as insignificant, found his submission of questions to be evidence of attentiveness, and found no concrete evidence of an inability to deliberate fairly despite the juror's past dealings with members of the Attorney General's staff. These decisions are supported by the record, and the trial judge gave no reason for reversing them on July 14. Moreover, there is no support in the record for the trial court's July 14 finding that Juror 13 had "continually" submitted questions after being "repeatedly" instructed not to. To the contrary, the record reveals that after the trial court issued—for the first and only time—an instruction on July 7 stating that questions needed to be held until deliberations, Juror 13 ceased his submissions.

Nevertheless, after the legal dictionary incident, the trial court found that "as a result of [a] cumulative effect," Juror 13's behavior warranted dismissal. We disagree, however, that this act constitutes a meritorious reason for dismissal, or contributed to a would-be "pattern" of violations on the part of Juror 13. There is no evidence that Juror 13's attempt to use the dictionary had an impact on his own ability to deliberate, or on that of his fellow jurors. His action, to be sure, evidenced an intent to supplement or modify the trial court's definition of the law of conspiracy in violation of the court's instructions. We do not condone this behavior and can understand why the trial court may have been frustrated with it. We do emphasize, though, that the trial judge did not discredit Juror 13's *voir dire* testimony that the dictionary had not yet been used, or find that the dictionary had somehow influenced Juror 13's view of the law of conspiracy. We therefore agree with the defendant that the legal dictionary incident was innocuous, since the record does not support a finding that Juror 13 would have gone on to deliberate inconsistently with the law handed down by the court.

We also note that under these circumstances, namely, where a legal dictionary has been brought into deliberations but has not been used in any relevant way, courts tend to reject calls for a mistrial. *See, e.g., United States v. Gillespie*, 61 F.3d 457, 459 (6th Cir. 1995). "When a jury makes unauthorized use of a dictionary, the trial judge should determine whether the jury actually substituted the dictionary definition of a legal term for

that given in the instructions." *Id.* (quotation and emphasis omitted). Absent prejudicial use of a dictionary, no grounds for a mistrial exist. *See id.* Similarly, here, we find the lack of a taint on the deliberative process to be controlling. The record does not demonstrate that Juror 13's unsuccessful effort to use a legal dictionary had a demonstrable impact on the deliberative process.

In sum, we find that the trial court's ruling that Juror 13 could not generally follow directions or deliberate appropriately is not borne out by the record in this case, largely in light of the trial judge's own extensive findings to the contrary. We further find that the final act leading to Juror 13's dismissal—a failed attempt to use a legal dictionary—had no demonstrable impact on the deliberative process. Therefore, while we understand that the State and the trial court may have experienced frustration with Juror 13's need for supervision over the course of a lengthy trial, we conclude that there was no meritorious reason to dismiss him from the panel. The trial court's order to the contrary necessitates reversal of the defendant's convictions, since the non-meritorious discharge of a deliberating juror is a violation of a fundamental constitutional right. *Opinion of the Justices*, 137 N.H. at 104-05. Juror 13 was properly impaneled; the defendant had a vested interest in his continued participation in deliberations that should not have been disturbed.

## B

The defendant also challenges the procedures employed by the trial court when it seated Juror 13's replacement. While he "makes no complaint about the court's instructions" to the jury, he maintains that the court secured inadequate guarantees from the remaining original jurors that they could and would completely restart their deliberations. We agree with his argument on this point, too, and thus find further grounds for reversal.

After the discharge of Juror 13, the trial judge undertook a brief *voir dire* of each of the remaining eleven jurors. Each juror responded in the negative when asked whether Juror 13's attempted use of a legal dictionary would have any impact on his or her deliberation, and whether Juror 13's dismissal and replacement would have an effect on deliberations. The jurors were also asked, as a group, whether they felt they could still be fair and impartial. All eleven responded affirmatively.

The court then issued the following additional instructions:

> The statute says that I am to instruct you to recommence deliberations and give you such other instructions as may be appropriate and then you shall renew deliberations. But that's not enough. That's not enough.

I am instructing you to do something more burdensome than that. I am instructing you to go back to the beginning. I'm instructing you to colloquially . . . start from square one and not bring the alternate colloquially up to speed. And you have a collective—I see[ ] nodding heads, and I'm very grateful for that.

You have a collective memory of where you started, I'm sure, and that includes going over exhibits, if it happened to be there, make sure you cover that base. If you started with the instructions, go back and start with the instructions. In other words, it's not simply enough to renew where you left off.

. . . .

. . . Ladies and gentlemen, I instruct you once again to begin at the beginning and we look forward to your work product. . . .

Is there anyone who does not understand the court's instructions? Alright. Thank you very much.

The jury was then released to deliberate, and ultimately returned guilty verdicts on the indictments.

■■■ RSA 500-A:13, V provides, in pertinent part, that after an alternate takes the place of a disqualified juror,

[t]he presiding justice shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate. The jury shall then renew its deliberations with the alternate juror.

As the trial judge indicated, the reconstituted jury could not simply resume deliberations after the legal dictionary incident. Instead, the jury needed to once again "start from square one" with its new member. Constitutional concerns about the substitution of an alternate juror for a deliberating juror stem from the right of a defendant to have each juror arrive at his or her decision after engaging in *all* of the jury's deliberations. *Opinion of the Justices*, 137 N.H. at 103-04. "The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them." *Id.* at 104 (quotation omitted). "Requiring that the trial court instruct the jury to set aside and disregard all past deliberations and begin deliberating anew is, therefore, essential to satisfying the defendant's constitutional right to a fair and impartial jury." *Id.* In this case, the trial court adequately addressed this concern with its instructions.

■■■■■ We have also held, however, that "the remaining jurors *should affirmatively state* that they can and will start the deliberations anew." *Id.*

(emphasis added). This holding is not merely hortatory. *Compare* ABA STDS. FOR CRIMINAL JUSTICE, *supra* § 15-2.9 cmt. at 176 ("[I]t is uncertain that, even when so instructed by the court, the jury could truly go back to 'square one,' discussing the case anew as though no prior deliberations had occurred, and repeating all prior arguments for the sake of the newcomer."). Therefore, prior to substituting an alternate for a deliberating juror, trial courts in this state must *ask* each remaining juror whether he or she "*can* and will start the deliberations anew." *Opinion of the Justices*, 137 N.H. at 104 (emphasis added). In other words, each juror should be certain of his or her ability to set aside all opinions and conclusions formed during prior deliberations. Only in cases where this is possible is a defendant's constitutional right to have a jury of twelve arrive at a common verdict sufficiently protected in the event that it becomes necessary to seat an alternate juror after the commencement of deliberations. Because the trial court failed to secure such guarantees here, we find further cause to reverse the defendant's convictions.

In reversing the defendant's convictions, our focus is not upon the nature of the crime charged but upon the fundamental constitutional right implicated by the removal of a deliberating juror. There is a sanctity in ongoing jury deliberations that should not be disturbed unless patently necessary, regardless of the nature of the crime alleged. With that said, we remand this matter to the trial court for further proceedings consistent with this opinion.

*Reversed and remanded.*

DALIANIS and GALWAY, JJ., concurred.